MARSUDA–RODGERS
INTERNATIONAL,
Plaintiff,

v.

UNITED STATES; Robert A. Mosbacher,
Secretary of Commerce; and U.S. Inter-
national Trade Commission, Defen-
dants,

and

The Timken Company,
Defendant–Intervenor.

No. 87–07–00772.

United States Court of
International Trade.

April 3, 1990.

Stein Shostak Shostak & O'Hara, Robert Glenn White, Los Angeles, Cal., for plaintiff.

Stuart M. Gerson, Asst. Atty. Gen., Washington, D.C., David M. Cohen, Director, Commercial Litigation Branch, Civ. Div., U.S. Dept. of Justice, and Velta A. Melnbrencis, New York City (James A. Toupin, Asst. Gen. Counsel, Washington, D.C., and Phyllis N. Smithey, Atty., Office of the Gen. Counsel, U.S. Intern. Trade Com'n, of counsel), for defendants.

Stewart and Stewart, Eugene L. Stewart, Terence P. Stewart, Charles A. St. Charles, James R. Cannon, Jr. and Geert De Prest, Washington, D.C., (Scott A. Scherff, Sr. Corporate Counsel, The Timken Co., Canton, Ohio, of counsel), for defendant-intervenor.

## MEMORANDUM OPINION

TSOUCALAS, Judge:

Plaintiff Marsuda–Rodgers International, a United States importer of tapered roller bearings (TRBs) from Hungary, contested the United States International Trade Commission's (Commission) cumulation of TRBs imported from Hungary with those from Japan, Italy, The Peoples Republic of China (PRC), Romania, and Yugoslavia. *See Tapered Roller Bearings and Parts Thereof, and Certain Housings Incorporating Tapered Rollers from Hungary, The People's Republic of China, and Romania,* Inv. Nos. 731–TA–341, 344, and 345 (Final), USITC Pub.1983 (June 1987).[1]

Plaintiff maintained that the Commission should not have used the cumulation methodology because the low quality Hungarian TRBs do not compete with the high quality Japanese, Italian, and domestic TRBs with-

1. Two members of the Commission concluded that imports from the investigated Communist countries did not warrant cumulation, and therefore dissented from the Commission majority's decision that the domestic tapered roller bearing industry was materially injured, or threatened with material injury, by reason of less than fair value imports of TRBs from those countries.

in the meaning of the cumulation statute, 19 U.S.C. § 1677(7)(C)(iv) (1982 & Supp. V 1987).

On July 26, 1989, this Court, for reasons contained in its opinion, *Marsuda–Rodgers Int'l v. United States*, 13 CIT ——, 719 F.Supp. 1092 (1989), found the Commission's decision to cumulate the low quality Hungarian TRBs with the high quality Japanese and Italian TRBs was not supported by substantial evidence and contrary to law. Accordingly, the court reversed the Commission's cumulative analysis and remanded to the Commission with instructions to cumulate only those dumped TRBs which satisfy the "reasonable overlap" test.[2] The Court stated in its opinion remanding this case to the Commission that:

> defendants ha[d] circumvented the proper order of injury analysis: decision as to appropriateness of cumulation analysis is subsequent, and not prior, to an affirmative finding of competition. Under the cumulation statute, a separate competition inquiry with respect to each country under investigation is a condition precedent to subjecting imports therefrom to cumulation analysis. Any other reading of the statute, such as defendants suggest, renders meaningless the standard for "competition," since imports from a source country will be subjected to cumulation analysis without a finding whether they "compete with [imports from other source countries] and with like products of the domestic industry in the United States market. 19 U.S.C. § 1677(7)(C)(iv).

*Marsuda*, 13 CIT at ——, 719 F.Supp. at 1099. The court further determined from the record that the unfairly traded Hungarian TRBs did not "compete with their domestic counterparts" and directed the Commission to make a traditional single country injury determination of these imports. *Id.* at 1101.

On December 21, 1989, the Commission filed its unanimous remand determination stating that

> "an industry in the United States is neither materially injured nor threatened with such injury, and the establishment of an industry in the United States is not materially retarded, by reason of imports from Hungary of tapered roller bearings and parts thereof, and certain housings incorporating tapered rollers, which the U.S. Department of Commerce has determined are being sold in the United States at less than fair value.

*See Tapered Roller Bearings and Parts Thereof and Certain Housings Incorporating Tapered Rollers from Hungary*, Inv. No. 731–TA–341 (Final–Remand), USITC Pub. 2245 (Dec.1989).

Plaintiff, Marsuda–Rodgers, now moves this Court for affirmance of the Commission's remand determination. The Timken Company (defendant-intervenor), on the other hand, maintains that the remand determination should again be remanded to the Commission for clarification and in depth analysis of the record in conjunction with this Court's interpretation of the cumulation provision. Timken states that it has "reviewed in its submission to the Commission extensive and substantial information in the record supporting a finding of competition and an affirmative cumulation determination, even under the statutory interpretation required by the Court's opinion." *Timken Company's Response to Remand Determination* at 3.

The Commission is required to cumulate the volume and effect of imports from two or more countries when they analyze injury *only* if such imports compete with each other and with like products of the domestic industry in the United States market. 19 U.S.C. § 1677(7)(C)(iv). In remanding this matter to the Commission, this Court noted that the purposes of the "like product" and "cumulation" provisions are different, and that "Congress would not have imposed on the Commission the additional

---

**2.** For a detailed discussion of the "reasonable overlap" test, refer to *Marsuda*, 13 CIT ——,

——, 719 F.Supp. 1092, 1097.

requirement of competition if Congress intended to make all 'like' products under investigation subject to a cumulation analysis. Therefore, the competition inquiry must necessarily be more vigorous than the 'like product' analysis." 13 CIT at ——, 719 F.Supp. at 1097.

Nearly all TRBs consumed in the United States are manufactured in the United States or Japan, with only a small market segment (utility trailers and nondriving axles) being dominated by imports from Hungary, Romania, Yugoslavia, and China. USITC Pub.1983 at A–26. The record reveals, however, that while a loss of U.S. market share occurred in four types of markets, namely, auto and auto related, truck-trailer, material handling, and aftermarket, imports from the four prematurely cumulated countries of Hungary, the PRC, Romania, and Yugoslavia do not service the first three of those markets at all. USITC Pub.1983 at A–20 and A–22. Additionally, plaintiff's imports do not constitute a substantial portion of aftermarket sales. *Id.*

The record further indicates that U.S. purchasers requiring high quality TRBs do not view Hungarian TRBs as substitutes in any respect for domestic TRBs and conversely, that purchasers of the lower quality imports do not purchase the more expensive high quality domestic TRBs. There is scant evidence, in what now amounts to an ample record, of direct competition between Hungarian TRB imports and domestic bearings.

On remand, the Commission performed a "competition" inquiry in full accordance with the Court's remand instructions and determined that a United States industry was neither injured nor threatened with injury by reason of TRBs imported from Hungary.

Accordingly, upon re-examination of the record herein, and having duly considered the Timken Company's response to the remand determination, the Court affirms the Commission's remand determination.

It is further concluded that as the plaintiff has abandoned all counts against the ITA and the counts against the ITC deter-mination with respect to Romania, this decision is final on this matter.